Judge Reimer, may it please the Court, my name is Brian Morris and I present the appellants to the State of Montana in this matter. I would request to reserve four minutes of my time for rebuttal. This case presents a blatant case of form-shopping. The Pelley's Reclamation Services Corporation and the bankruptcy trustee, in nine of their eleven counts, alleged a series of state law tort and contract-based claims arising from post-confirmation agreements. Those two agreements were commonly referred to as the Letter Agreement, which was an interim agreement to allow Reclamation Services Corporation to perform reclamation work at the Zortman-Landusky mines in Montana. That was later superseded by a more formal agreement known as the Master Agreement, again post-confirmation. The Master Agreement was exhaustively negotiated. It contained an integration clause. This was the only agreement between the parties. It contained all terms of the agreements. It expressly superseded the Letter Agreement. And more importantly, it contained a choice-of-law provision and a choice-of-form provision. Any disputes related to this Master Agreement were to be adjudicated under the laws of the State of Montana and the courts in the State of Montana. Now, RSC and the trustee are not satisfied with this form of agreement they negotiated after exhaustive detail, and they seek to invoke the bankruptcy court's jurisdiction through two separate claims in their complaint. One of them alleges a breach of good faith, and the second one alleges fraudulent inducement relating to two pre-confirmation agreements, the Zortman Agreement and then the confirmation plan itself. Now, without these two claims alleging violation of pre-confirmation agreements, the rest of the claims here and the claims of bankruptcy court jurisdiction collapse like a house of cards. Only when you have these two claims do you start the daisy chain that the appellees used to invoke bankruptcy court jurisdiction. Because we have these pre-confirmation agreements, there's an alleged not breach of the terms themselves but breach of the intent of the overall agreement along with the fraudulent inducement claims. And then from there you go to this related jurisdiction, the supplemental jurisdiction, where you pull out the beginning, the base of their claim, the foundation, these two pre-confirmation claims. The rest of the claims in their assertion of bankruptcy court jurisdiction collapses. Now, it's important to note here, when you look at the allegations in the complaint, 159 paragraphs, 14,000 words in their response brief, nowhere do the appellees allege any violation of a particular term of this Zortman Agreement, which is a pre-confirmation agreement, or of the confirmation plan itself. Instead, the best they can do is allege that the state of Montana violated the expectations of the other party, what their understanding was, but no particular terms of any of these agreements. Isn't that a merits-based point more than a subject matter jurisdiction point? Well, this is the motion to dismiss phase. And I think under normal circumstances, if we were in state court in Montana litigating this claim, pursuant to the master agreement forum clause, Montana would probably lose this motion because you have to look at the allegations of the complaint and consider them the light most favorable to the non-moving party. But here, we're in a different circumstance. We're here where a party is trying to take the unusual step of invoking the bankruptcy court's jurisdiction against the state of Montana, which goes against the usual level of immunity claim. So when you evoke bankruptcy court jurisdiction, there are certain jurisdictional facts that a party has to prove exist in order to get there. Now, you look at the complaint or the government agreement, which is the basis for their bankruptcy court jurisdiction. Not a violation of the terms of that agreement itself, but more a violation of the expectations, understanding around that agreement, the breach of good faith, and this fraudulent inducement. On the fraudulent inducement claim, Your Honor, the normal remedy for that would be a modification of the confirmation plan itself, not this damages claim they're asserting. And I guess one of the reasons they don't want to seek modification of the plan itself is it opens up other parties to come back in who are parties to these agreements to seek changes as well. So... Are the issues of jurisdiction and 11th Amendment immunity separate? I think they are, yes. Is it possible the bankruptcy court, for purposes of this motion, does have jurisdiction but that the state has not waived its 11th Amendment immunity? That's one of the issues presented here, yes. And I'll get to that argument as well. But I think to understand... I think he was asking if it was possible for the court to have jurisdiction, yet you have not waived your sovereign immunity. Exactly. And the reason Montana has not waived its sovereign immunity, the law of this circuit is that, under the czar opinion, is that if a court files a proof of claim, a state files a proof of claim, the state opens themselves up to compulsory counterclaims or recoupment based on that proof of claim. Now, in this case, Montana filed three proofs of claims for $8.5 million. And those claims related to underfunded reclamation bonds had been posted by Pegasus Gold Corporation. Now, that waived Montana's sovereign immunity under the terms of the czar to the extent of compulsory counterclaims or claims for recoupment. Montana settled that claim, though, on the proofs of claims, by entering into the assortment agreement. The assortment agreement called for three separate things, and this is important for the court to understand. It called first for the payment by Pegasus Gold Corporation of $600,000 to the state of Montana. The state of Montana could use that $600,000 for reclamation purposes at the mine sites to be performed by a reclamation services corporation. That $600,000 was paid to the state of Montana, and there's no dispute in the record that the state of Montana paid reclamation services $600,000. The assortment agreement also called for Pegasus Gold Corporation to pay another $450,000 to Montana for reclamation services to be performed at the state's sole discretion. So those two payments were made to Montana, and they, in return for their $8.5 million proof of claim, gave that up in return for $1,050,000 for Pegasus Gold Corporation. That point, upon completion of that agreement and compliance by all the parties, performance by the parties, Montana's sovereign immunity waiver ended. Montana was out of the bankruptcy proceeding, and we are proceeding now with post-confirmation conduct for which the bankruptcy court does not have jurisdiction. So to answer your question, first, there is a possibility that we get into light arguments about the jurisdiction, may not agree that the court doesn't have jurisdiction, but Montana's allowable minimum immunity was reinvigorated at the point that the compliance with the terms of the assortment agreement were done and Montana no longer was subject to affirmative claims for recovery, which is what RSC seeks in this case. Let me focus on the claims with respect to the assortment agreement and the plan. Yes. Part of what is sought is rescission of the assortment agreement. Yes. Why does that not afford subject matter jurisdiction, putting aside the question of immunity for the moment? Well, I think the first response is that the states already performed that agreement, and all parties agreed that that was equitable and fair resolution of the claims. There were other parties besides the state and Pegasus Gold Corporation. There were the United States of America was a party on behalf of themselves and on behalf of the Gros Ventre and Assiniboine Indian tribes, and all those parties agreed this was a fair resolution, and it settled a number of claims, not just the claim between Montana and Pegasus, but also claims by the other parties against Pegasus. So Pegasus benefits substantially from signing this agreement, and if they want rescission then it opens up these other parties to come back in here and say, well, wait a minute, this is a new agreement here. We want to negotiate the term because things haven't worked out as we wished. Well, but doesn't that in a way just go to show that it is related to, does affect the confirmation process? Well, Your Honor, the assortment plan, it's completed, it's performed. The bankruptcy court confirmed that plan. The appellees don't seek to go back to open up the confirmation plan. That's been approved and executed. So you can't go back and try to rescind the assortment agreement without in turn reopening the confirmation plan. They don't seek that relief. So I think there's some inconsistency there in their claims. What they're seeking is affirmative monetary recovery, and rescission means they want their money back on the pay of the state for the reclamation work performed by RSC. Now, when you get to looking at the moving beyond the immunity question to the jurisdictional question, you do not have any sense here where this is conduct that would arise within the bankruptcy proceeding, that the claims relate to post-confirmation conduct that takes place in Montana. The RSC alleges, well, this is violation of the letter agreement, violation of the pre-confirmation agreements. If you look at their complaint, they're alleging inadequate budgets, and this is on the post-confirmation work in Montana. They're alleging failure of Montana to pay on invoices. They're alleging Montana withheld RSC's opportunity to continue performing under the master agreement, and they also terminated RSC's contract under the master agreement. This is all conduct that relates to the master agreement. So they're trying to connect conduct relating to the master agreement, alleged breaches of that agreement, back to what happened when RSC was formed as part of the assortment agreement. You can't make that claim without a bankruptcy court jurisdiction when the bankruptcy proceeding is completed here. Now, the argument that they'll make is, well, this affected the bankruptcy proceeding because RSC was potentially generating more revenue that would then go to the creditors. But under that logic, there's no ending point for bankruptcy court jurisdiction. RSC would have to go around with a blinking light on them saying, well, whenever contractors beware, whenever you enter a contract with us, you're likely to be dragged back into bankruptcy court Reno, Nevada. The state of Montana, what if they had granted RSC the contract to complete the final reclamation work? Would they still be dragged back into bankruptcy court Reno because there's alleged breach somewhere down the road? At some point, the bankruptcy court jurisdiction has to end, and it ended in this case when the assortment agreement was fully performed, the bankruptcy court approved the plan, and RSC went to Montana and started conducting this reclamation work. Now, with respect to the other claims of jurisdictional hooks here, this was the related to jurisdiction. Now, the related to jurisdiction goes back to pre-confirmation conduct. Now, the conduct that forms the basis for RSC claims, though, is not pre-confirmation conduct, but this alleged post-confirmation conduct that took place in Montana when disputes started arising over billing, disputes started arising over the scope of work, those kind of issues. Another thing to keep in mind here, the appellees will continually try to conflate two different tasks that were being done. The assortment agreement, the pre-confirmation agreement required the state to pay the $600,000 it received to RSC for reclamation work. Now, reclamation work is separate for water treatment services, and water treatment services were part of the master agreement, which is post-confirmation work, and there were three different task orders under the master agreement. They called for water treatment work, continued reclamation, and by the way, the reclamation work under the master agreement was for $600,000, the same amount as the assortment agreement, and that same source of funds was used to pay that amount. So once Montana paid RSC the $600,000, the bankruptcy court's jurisdiction must end. Otherwise, there's no limiting principle here that would separate Montana from the bankruptcy proceeding. Once Montana filed their proof of claims on their underfunded reclamation bonds, under the logic of RSC, Montana would be subject to bankruptcy court Reno's jurisdiction for the next 20, 30 years until RSC had gone on its way to finish the work in Montana. Counsel, when they made the deal to set up RSC, as I understand it, RSC was created by the trustee, capitalization of $1 million was put in to run RSC capital fund, and it was debtor money. It was debtor money that was put in to do that, and furthermore, all the shares of that corporation were owned by the trustee. So here's my question. If the state hadn't agreed to that relationship, if they had just agreed to take, let's say, $1 million and go their way and get the reclamation prepared, maybe get $2 million because of the million for the capitalization, they took X amount of money and walked away, their claim was resolved, they're out of the court. As you say, their immunity is reinstated because it's all over and done, and then the state of Montana made a contract with some other company, let's say Astro Company, a totally unrelated company to the bankruptcy estate, and there were these disputes between the state of Montana and this corporation. Wouldn't you have a cleaner case for saying to the bankruptcy court, this is none of your business. Your debtor made a deal. He's resolved. He has no more reclamation obligations. He's relieved of that. We have no more claim. We're resolved from that. So this thing that we're doing on its side with this other corporation is none of your business. Wouldn't that be the case? If you agree with that, then my real question is why did the state of Montana make a deal where the corporation, RSC, that they're going to deal with is an asset of the bankruptcy estate? Your Honor, I would agree it would be a cleaner case, the scenario you described. You have to understand the facts of this case, though. Pegasus Gold Corporation had inflicted terrific environmental damage at their mine site, the state of Montana. Those mines were not being cleaned up. They were declared bankruptcy in Reno, Nevada, seeking bankruptcy protection. There were ongoing environmental exigencies needed to be cleaned up right away. There were a couple hundred workers. Wouldn't you hire somebody to come in temporarily and clean them up? There were a couple hundred workers. If you could hire RSC to do it, you could have hired anybody to do it. Yes, we could have hired RSC. But there were a couple hundred workers thrown out of work there. They were on site. They were ready to go. They could do it more quickly than other contractors were coming right away. That was part of the reason for the RSC being contracted. But, Your Honor, look back on Excerpt Record 174, the plain language of the assortment agreement. It does not require the state to even use. They could have held on to this money. The $600,000 was to be used at the state's sole discretion, and any unpaid amount to RSC was refunded back to Pegasus. So the state had no obligation to contract with RSC. The state could have performed no reclamation work at that time and simply given Pegasus Gold Corporation the debtor the $600,000 back once Montana hired a full-time contractor. Didn't the master agreement require the state to deal with RSC? That was a post-confirmation agreement. That was an agreement between RSC and the state. It was really the solemnization of the assortment agreement. And remind you, Your Honor, that master agreement exhaustively negotiated by the parties contained a forum selection clause, disputes resolved in the state of Montana under the law of the state of Montana. That's what RSC, the company created by the plan, that's what they wanted. That's what they negotiated for. This was a long and hard negotiation dragged on for nearly six months, and they selected to have disputes resolved in the state of Montana. Now they don't like the way things turned out, and they want to run back to bankruptcy court in Reno, Nevada. That's not what the law requires. And in the plain language of the master agreement, there should be held to bring these claims to Montana. And the terms of the assortment agreement don't require the state to do anything beyond if they choose to pay $600,000 for reclamation to RSC. Didn't you just start your argument by saying that a couple of these causes of action avoid the contract, breach of good faith and fraud and inducement? Those are torts. Yes. I'm sorry, Your Honor. I missed the first part. You pointed at the beginning that those two causes of action avoid the argument that you have a forum clause because it's a noncontractual – those are noncontractual cause of action. Well, Your Honor, if you – back to my point about you have to allege certain jurisdictional facts to get into bankruptcy court. You can't just look at this and say, well – Well, you've got an asset of the bankruptcy. You're doing business with a company that's an asset of the bankrupt estate. So in that – under your logic, then, any company who signed a contract with RSC could be drawn back into bankruptcy court because RSC initially was a creature of the bankruptcy court or a product of the bankruptcy proceeding arena. It seems to me – it's not my position, but it seems to me like that's one of the positions of your opponents. I agree. Establish related and they're going to claim a damage to one of their assets. And that takes away money that would be available for creditors. And that's their relatedness. Well, Your Honor, under that scenario, that could – any time a company emerges from bankruptcy or any time you have this kind of proceeding, it could potentially take money away from the creditors. But the point is, under bankruptcy court jurisdiction, combined with the immunity afforded to states, you have to have some limiting principle. There's no end to this. If RSC is a creature of the bankruptcy proceeding and any revenue generated goes back to the creditors, then anyone RSC deals with, whether it's the state of Montana or future parties with whom it contracts, all those parties run the risk of being dragged back into bankruptcy court in Reno to have torts resolved and have contract disputes resolved. Well, I'm not sure – I'm not trying to stand for anything in particular, but that's what your opponents seem to be suggesting. And I don't think the law supports that logic. The law looks – once the confirmation plan is approved, the general rule is that ends the bankruptcy court's jurisdiction. Now, as I said, 9 of the 11 claims here relate to post-confirmation conduct. Only the two claims they try to allege not violations of the terms of these agreements, but some – the tort claims you described, the breach of covenant of good faith and the fraud and inducement. That can't be enough to get you back into bankruptcy court. Under that logic, any time – Montana would have been subject to bankruptcy court jurisdiction under almost any scenario. Mr. Morris, if you were – your position is correct on waiver of sovereign immunity, does it matter to you the extent to which subject matter jurisdiction existed in the bankruptcy court apart from some hook that gives it the power to rule on the issue? On behalf of the State, no, Your Honor. But with respect to Spectrum, who was the company that – successor company to RSC, against whom RSC alleges the court has supplemental jurisdiction, I think that was a concern of the State, that there's no supplemental jurisdiction with respect to the claims against Spectrum Engineering. And are you representing Spectrum by the indemnity thing, whatever? Okay. All right. I see my time is up, and I'll reserve the remainder for rebuttal. Thank you. May it please the Court. My name is Michael Richman. I'm with Mayor Brown, Roe and Maugh, and I'm representing Harrison Golden as the liquidating trustee of Pegasus Gold Corporation Liquidating Trust and the Reclamation Services Corporation. Montana wants this case to be about two things that it decidedly is not. They want it to be a proof of claim case where the court evaluates the extent of their sovereign immunity waiver solely by reference to the proofs of claim that they filed. And they want it to be nothing more than a three-party private contract dispute that can be dealt with in State court and had nothing to do with the bankruptcy case. Their entire argument rests not only on these two false premises, but on an ignorance and failure to address the complaint. This was a motion to dismiss. The complaint's never been answered. The facts alleged in the complaint have to be taken in the light most favorable to the plaintiffs. This is a jurisdiction question. Yes, Your Honor. But many of the arguments that were raised by Montana go to their factual rebuttals of allegations. I understand that. But it's a jurisdiction motion. I mean, the court can decide jurisdictional facts. Yes, but I – but a rebuttal of facts alleging, for example, breach of contract to say, as counsel did, well, Montana paid and fulfilled its terms of the bargain, that's a matter for the trial court. It hasn't been decided. And there's no evidence in the record on that. That's really what I meant, Your Honor. The point here, the important point, and I will come back to this, is that Montana is being sued for the harm that they caused when they voluntarily entered into the bankruptcy court, taking off their cloak of sovereign immunity. They engaged in a deliberate course of conduct. Well, wait a minute. What they did was to file a proof of claim. What your claims in the main relate to is the plan. So on the one hand, you've got to focus on the proof of claim. On the other hand, you have to focus on the plan. And just because they filed a proof of claim doesn't necessarily logically mean that everything that happened thereafter, as between you, as between Trust, as between RSC and Montana, relates to the bankruptcy. Your Honor, if all they did was file proofs of claim, you might have a point. But the record here shows extensively that the bankruptcy court showed that this state entered the bankruptcy case in its early stages and participated, filed motions, filed objections. Well, of course they did on their proof of claim until it got settled. They then participated in multi-party negotiations that became part of agreements that were incorporated into the plan, which is the fundamental purpose of a bankruptcy case. And they became bound by that plan. The Reclamation Services Corporation was a federal instrumentality of a federal contract known as the confirmation plan. They became bound by that. They did all of that voluntarily. They could have prosecuted their claims in different ways. This is not just about whether the proofs of claim set the limit of what they did, but whether deliberate voluntary conduct by the state suddenly can be thrown off. Can they put that cloak of immunity back on when they're called to account for the consequences of their actions when they didn't have immunity? That's really the issue. Well, all right. You've got two problems here. One of them is a subject matter jurisdiction question, which I take it you would agree has to exist before we even get to the sovereign immunity issue? I would agree with that, Your Honor. All right. So why don't you start there and just say why there's subject matter jurisdiction over what it exists. Your Honor, the bankruptcy court undoubtedly, under the case law, has subject matter jurisdiction to enforce the plan. We know that courts have inherent authority. So where is the plan in any way? I mean, where is the plan breached in some way by Montana? The complaint alleges that Montana breached obligations that it entered into in connection with the plan. Those obligations included its good faith requirement of fulfilling its agreements to allow Reclamation Services Corporation to have a fair opportunity to be in business. Where does that trace back to anything that's going to affect consummation of the plan? Well, quite simply, Your Honor, the Reclamation Services Corporation was a rather creative enterprise put together by the creditors and the debtors to provide some vehicle to do several things. One, to try to get better recoveries for creditors than would otherwise be the case. And creditors devoted their own, gave up recoveries they might otherwise have had in order to capitalize Reclamation Services Corporation. You know what? Let me try that. And I'm not going to try it. I'm sorry, but I want to see your point. I'm just going to try it one more time. Okay. I'm having a lot of trouble seeing a connection between the claims that you make and an effect on the administration of the plan. And if you could just give me the caterpillar, give me the chain, so I'll understand it. Short of a closing argument. Okay? I don't need that. I understand why you're annoyed. But what I want to know is where the actual chain and the links in the chain are. The plan established the Reclamation Services Corporation and a liquidating trust which runs the Reclamation Services Corporation. Yes. Essentially, at the time of plan confirmation, this corporate vehicle was the only remaining way to deliver value to creditors. It was supposed to create value in the Reclamation Company and be able, the hope was that the company would acquire the business and then be sold at a multiple and deliver value that could be distributed to creditors. This was what all the parties under the plan were pinning their hopes on. Now, wait a second. Can I just stop it there? I don't recall reading that RSC was created for any other purpose other than to do It wasn't created to run a gold mine. It wasn't created to run a transportation company or a pharmacy company. It was set up to run a reclamation of damaged real property and to run a water treatment system for a limited period of time. Well, no, Your Honor. Actually, it was set up to begin with those assignments but to have an infrastructure, which it did have, and a capitalization and an employment base that would allow it to bid for other reclamation projects anywhere in the country. The idea was this was the startup with the projects that already existed in Montana and that it would grow from that. It had an inside track to get the business in Montana. All it wanted was a fair opportunity to do that. These are all expectations that you're describing were in the minds of people apparently because it's not in the record. There's no record of this. Your Honor, I believe that much of this is in the disclosure statement. It's also pleaded in the complaint. And the complaint has to stay. You're talking about the document. It's not the complaint. The complaint's not the plan or the Zortman agreement or the master agreement. But the complaint, we haven't had trial. We haven't had a chance to make the record. We're talking about subject matter jurisdiction where you can find jurisdictional facts. You don't have to take what the complaint says as true. So the question is you've got to show that there is some relationship between your causes of action and something that's going to affect the consummation of the plan. And I don't see anywhere in the plan documents or in the Zortman agreement anything about these hopes or aspirations or the employees or any of that stuff. It may have existed, but I don't see it. Your Honor, I don't believe, and I don't mean to be so argumentative with the Court. I apologize. I'm responding to the questions. But I think from a jurisdictional standpoint, in order to have subject matter jurisdiction, you have to show an effect on the plan. You have to show an effect on the rights and obligations, the standards that have been set forth in the circuit right. And the allegations are we seek rescission of the Zortman agreement. We seek to recover the benefit of the bargains that creditors had. This is what is alleged in the complaint. This is what ties back to the bankruptcy case. If we can undo, we feel, and what the complaint alleges, is that this appears to have been a scheme from the very beginning to never comply with the obligations and that all of these are essentially a step transaction that tied back to the initial agreements in which they were negged. We're seeking relief for the reneging of the plan agreements themselves. It is a fundamental instrumentality of the plan. It's fundamental that the bankruptcy court retains and has subject matter jurisdiction to enforce its plan. The cases say that. So as long as there is a prima facie case, a complaint-pleaded case that hasn't been refuted, there is evidence for it that we would show a trial, that these various – and that's why I referred to what counsel was saying before. I don't think that Montana can say, well, we fulfilled the agreements and, therefore, there's nothing to be tried. That's a determination for the trial court and it hasn't made it yet. The jurisdictional facts for this Court are that the complaint alleges reneging of the basic plan agreements. That's the key thing. If there were no plan agreement, if this was just – I agree with Montana. If we didn't have these agreements embodied in the plan and Reclamation Services Company was created and a year after the bankruptcy it entered into a contract with Montana and there was a dispute, that would be a state court's – Well, you said these agreements embodied in the plan. The only agreement that's embodied in the plan is the Zortman agreement. Correct. That's correct, Your Honor. The Zortman agreement sets forth the financial contributions of the parties, the creation of Reclamation Services Corporation and the rest of the record of the bankruptcy proceeding with which the bankruptcy judge was quite familiar, dealt with the disclosure statement, dealt with the hearings. The record below all showed – I mean, our argument in the complaint is that there were obligations apart from these agreements that dealt with their good faith obligation to comply. It doesn't necessarily – you don't write in a contract that a party has a good faith obligation to live up to those obligations, but that's what the law is. And our argument is they didn't do that. And when you look at the series of steps over the ensuing months as they developed, it's clear that it flows back to their never having given Reclamation Services Corporation a fair chance. Your Honor, in addition to that, six months after the plan was confirmed, there was a dispute between Reclamation Services Corporation and its employees and the State regarding Reclamation Services Corporation's threat to stop doing reclamation work, water treatment work, and the employees' concerns that they wouldn't have employment benefits. That dispute was heard in the bankruptcy court, and Montana showed up. They never said at that time, Judge, there's no subject matter jurisdiction. In fact, Judge Zeib held there was subject matter jurisdiction over that dispute. They didn't say we have sovereign immunity. This is six months after plan confirmation when Montana now says we can't be hauled back into the bankruptcy court. There has to be an end to it. And we know from the case law that bankruptcy court jurisdiction doesn't end with confirmation. If it did, the courts could never enforce their own decrees. Counsel, if the Zortman agreement were rescinded, that would also rescind the liquidation plan, would it not? No, and actually let me comment on that. How could you not? Wasn't that part an integral part of the liquidation plan? It involves the resolution of all these claims by all the reclamation claimants, the bonding companies, the State of Montana. If you rescind that, the whole thing comes down, and aren't you right back into the bankruptcy with all these claims in there, no resolution, no disposition in favor of Pegasus. They're still liable for everything. You're going to unwind the clock to .1, aren't you? We can't do that. The bankruptcy code doesn't permit you to unwind a bankruptcy plan once six months have passed after confirmation. You can't do it. So what we tried to do here was fashion a remedy that would compensate creditors for their losses. And so what we did, the damage claims are based upon an expert's evaluation of what the business would have been worth had it been allowed to function without the alleged interference by the State of Montana. Our feeling was if we could deliver the balance. Well, then why doesn't that just plainly have to do with something that has nothing to do with the bankruptcy? But it does because all of that value is value that belongs to the creditors that would have to be distributed in accordance with the plan by the liquidating trustee under the plan. Well, that's what the obligations were. Maybe. We're not talking, you know, you're talking here about which forum you pursue this in, right? Yes, Your Honor. So? We never left the bankruptcy court. The case is still open. But what function must be served? What function must be served by this choice of forum clause in the master agreement? Well. Is that useless as a? It's not useless if there were a discrete dispute under the master agreement that dealt with the failure. You allege in your complaint breach of contract to cause of action for that. And you allege breach of contract involving PGC. They're not even a party to the master agreement, as well as RSC. And you allege conversion. Well, that's not a contract cause of action. But you allege three, at least three causes of action which are clearly contract cause of action. And yet you claim that there's no forum that's relevant. There's no forum selection clause even relevant here. Not in a case like this where this is an integrated step transaction. And the allegations are that all of these different violations were part of a scheme to undermine the plan obligations and to renege on the plan agreements. If all we had were some failures to pay bills under the master agreement, I wouldn't argue with you. You would be right. I would say the master agreement would control. Well, the liquidating plan agreement only sets up the RSC for the purpose of reclamation and water treatment. This idea about them going off into the future and into the sunset, that's a nice dream, but it has nothing to do with the liquidation agreement. The liquidation plan. It has to do, it does, in the sense that it has to do with the calculation of the damages for the breach and reneging of the plan agreements. And if we can prove at trial, and we would have a chance to prove this presumably in any forum, all right, this isn't necessarily a bankruptcy-driven thing. But if we had an opportunity to prove that had the business been given a chance to proceed as everyone intended it to, that it would have been worth this amount of money and that's what our damage should be, all of that value would redound to the benefit of the creditors because we would be obligated under the plan to distribute it to them. I guess where I don't connect with you is where you say what everybody intended it to be. Whatever they intended it to be, that's what I call the dream. But the liquidation plan calls for the creation of RSC for a specific purpose, and that is to work off the reclamation damage which Pegasus caused in this area and to run a water treatment plant. That's what the plan says in writing. Now, your dream about what was in mind for this corporation is interesting, but it has no place in print on any of these documents. It is in the disclosure statement. In a bankruptcy case, when it's time to confirm a plan, you have a document that's like a prospectus for investors called a disclosure statement, which sets forth in greater detail than the plan, which is more like a contract, of what the purpose of various provisions are. The disclosure statement may not go into as much detail as your Honor just described, but does have the detail of what the purpose of this company was. It was to preserve jobs because the employees at the Zortman site were going to be out of work if we didn't come up with a vehicle to keep them in business, and it was to create this. In fact, we had to disclose these dreams, as your Honor says, because we wanted creditors to vote for this. We wanted them to agree to part with $1,600,000 in money that otherwise would have been distributed to them in order to help us capitalize Reclamation Services Corporation and also make additional contributions to the State of Montana in order to get the water treatment work done. We had to convince them of that, so it was in the disclosure statement, and it was part of the broad understanding that everybody had in the bankruptcy process. And that's what I say, that isn't all pleaded in the complaint, but that's part of evidence that would come into play. It isn't even incorporated in any contract documents nor any confirmation plan. It isn't incorporated anywhere. It's in the disclosure statement, which is a record document at the bankruptcy court. You would not normally put that kind of information in a plan. A plan is supposed to be drafted more like a contract and has the particular distributions. The Zortman agreement also is described at greater length in the disclosure statement than you would find in the plan. There were records of proceedings in the bankruptcy court when all the parties were there, including Montana. Montana negotiated this agreement in the court, in the courthouse, along with the Justice Department and the other parties. Counsel, wasn't our PGC absolved in this confirmation agreement, this liquidation agreement? Wasn't PGC absolved from any liability for reclamation other than is set forth in that agreement? They had no more liability for any of the damage. Isn't that right? It's true. Would that be a yes or no? I think that would be a yes or no. It would be a yes. Likewise, the state of Montana is bound to accept only what came out of that confirmation agreement. They gave away their $8 million whatever it was claim as well. Isn't that right? Not exactly. They still have an $8 million claim in bankruptcy? No, they don't have an $8 million claim in the bankruptcy. They don't have any claim in bankruptcy. But they made related agreements with the surety bond companies to get funding from other sources and all the pieces work together. That's all I mean to say. Well, that's fine. But they're still walking away from any claim they have left. Remember, they said $8.5 was over and above. All of the bonding money, they're in their court because of a deficiency. And I'm just asking, didn't they walk away from all that deficiency except for the bucks they got? They walked away from the exchange for an agreement for us to put credit or money to capitalize RSC, to do the work, to keep the employees in business, to give RSC the opportunity to bid for the future work so that they could stay in business at the sites. It was a total bargain. It wasn't just we pay the money, walk away, and then nothing else gets done. It was future directed. And you couldn't tell if they were going to breach those obligations until you got to the future. Every contract has to be, you don't know if it's going to be breached or not until you get to the future. Who was going to put all this money into RSC? Were they in business to go to the public and ask the public to give them money to reclaim Montana? There was a very specific plan that was outlined in the disclosure statement and in the hearings. And it was made known to everyone. RSC was going to set up their infrastructure, their employees, and begin to do work at the Zortman mining site. The state had an obligation, we contend in the complaint, to set up a public bidding procedure, competitive bidding procedure, so that longer term beyond a temporary period of time, the reclamation and water treatment work at the Zortman site would be bid out and there would be a long-term contract. With whoever was the successful bidder. That's correct. And we might not have been the successful bidder, but we certainly had the inside track because we had the people with the expertise on the site. In fact, the complaint alleges that Spectrum Engineering, which came in and took over the business, basically stole our employees. They took our infrastructure and they continued to operate. So we had a good business in place that could have done that. Had we not been undermined, had we not had the state not cooperating with us, not doing the competitive bidding in time, and had we then gotten the contract longer term, we would have then had a source of financing of continued cash flow that would have then enabled us to go and bid for other work. We would have had an experience base and a credibility base to bid for reclamation work in other states. In other parts of Montana. We already had done investigations of other work that we could bid for. And we were ready to go down that road. Is it your position that the question of jurisdiction and 11th Amendment immunity go hand in hand? I think they do in this sense. I think that if you are dealing with a waiver of immunity, as I believe we are, where a state has come in and it has committed acts for which there should be consequences, and then you call on the state to answer for those consequences being directly related to the area of agreed waiver, then I think a court necessarily has subject matter jurisdiction to enforce that because it relates back to the period. That assumes you had valid subject matter jurisdiction to begin with, and I think you did because it was in the bankruptcy case. So I would find it difficult to have a court adopt a rule that said that I can't enforce, I can't enforce or call a state to account for the consequences of its actions because now I'm cut off from subject matter jurisdiction. Another way of saying it is it would necessarily, in my view, relate back to what was clearly within the scope of the subject matter jurisdiction of the bankruptcy court. I'm out of time.  Thank you, Your Honor. I believe Judge Brewster hit the nail on the head when he talked about these hopes and dreams and aspirations of RSC. Counsel talks about, well, he concedes that these hopes and dreams aren't contained in any of the documents. They're not referenced in any of the contracts. They're only contained in what he refers to as a disclosure statement, which itself is not contained or referenced in any of the documents between the state of Montana and the parties to this dispute. So what we're left looking at is did Montana perform its obligations under the agreements to which it was a party? And there's no dispute that Montana paid $600,000 to RSC for reclamation services. If you look at Excerpt of Record 174, this is the assortment agreement. There's nothing in that language that says Montana has to go to a competitive bidding process. It's that reclamation performed at Montana's sole discretion. There's nothing that says that RSC has a – is my time up? I'm sorry, Your Honor. Wrap up, please. Okay. I'm sorry. That RSC has a fair opportunity to bid, would have inside track. These are hopes and aspirations that are not incorporated in any of the documents. So, Your Honor, to conclude, I would – Hawkins has a question. I just have one question. Yes. If we were to conclude, big if underline, if we were to conclude that there was no jurisdiction here, does the State concede that the time involved in pursuing these matters through this Court would equitably toll any State statute of limitations? Yes, it would, Your Honor. And RSC would have the opportunity to present these hopes and dreams to a State court in Montana as the master agreement calls for. Thank you for consideration. Thank you, Mr. Morris, Mr. Golden, for your argument. It's helpful on both sides. And the matter just argued will be submitted. We'll now hear argument in – of Enola.
judges: Rymer, Hawkins, Brewster